IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


ARV OFFSHORE CO., LTD.,          §
                                 §
              Plaintiff,          §
                                 §
v.                               §          CIVIL ACTION NO. H-09-0944
                                 §
CON-DIVE, L.L.C.,                §
                                 §
              Defendant.          §


**<u>MEMORANDUM OPINION AND ORDER</u>**


This breach of contract action was tried to the court from July 11 to July 13, 2011. Because of the evolving nature of the parties' arguments concerning the plaintiff's damage claims, the court requested that the parties submit post-trial briefing. Having carefully considered the evidence in light of the parties' arguments, the court is now prepared to rule.[1]

The background of this dispute is described in the very thorough Memorandum and Recommendation of Magistrate Judge Nancy K. Johnson (Docket Entry No. 32), which the court adopted (Docket Entry No. 41). Judge Johnson concluded that plaintiff ARV Offshore

---

[1]The court normally endeavors to enter findings and an order quickly after a bench trial, but given the somewhat confusing nature of some of the post-trial briefing, including many issues raised for the first time after trial, the court took additional time to carefully consider the parties' many arguments. Any argument made by the parties but not addressed in this opinion was considered by the court to have insufficient merit to warrant discussion.

Co., Ltd. ("ARV") and defendant Con-Dive, L.L.C. ("Con-Dive") entered into a binding contract[2] for ARV's use of the Orca saturation diving system (the "Orca") in order to install a sub-sea valve structure on the seabed of the Gulf of Thailand,[3] and that Con-Dive anticipatorily repudiated the contract on July 10, 2008, by notifying ARV that the Orca system would not be available for use by ARV.  Judge Johnson concluded that issues of fact existed as to ARV's fraud claim.

At the beginning of the trial ARV abandoned its fraud claim. (ARV's promissory estoppel claim was moot since the court granted ARV summary judgment on the breach of contract claim.)  The issues that remained for trial were the amount of damages and attorney's fees that ARV was entitled to recover from Con-Dive because of its breach of the contract.  Because evidence relating to damages substantially overlapped the issues of contract formation and repudiation, the court allowed the parties to present evidence on all issues so that the court could fully appreciate the parties' damage arguments and consider whether it should reconsider its order adopting Judge Johnson's Memorandum and Recommendation.

---

[2]Letter of Award ("LOA"), Plaintiff's Exhibit 1.

[3]ARV had entered into a contract with PTT Exploration and Production Company Limited ("PTTEP") to do this work.  Defendant's Exhibit 18.  ARV was also involved in projects for PTT, a distinct entity, during the same period.  Transcript of Proceedings, July 11, 2011 ("Day 1 Transcript"), Docket Entry No. 83, pp. 21:19-22:1.

Having now heard all of the evidence, the court remains persuaded that it was correct in adopting Judge Johnson's Memorandum and Recommendation and in granting ARV's motion for summary judgment on the existence and breach of ARV's contract with Con-Dive.

The issues to be decided by the court are therefore the amount of damages and attorney's fees ARV is entitled to recover. ARV argues that it incurred damages of $5,426,867.76. Con-Dive argues that ARV is not entitled to recover any damages because ARV presented no evidence of ARV's revenues or net profit earned or loss incurred on the project for which Con-Dive had agreed to provide the Orca system.

## I. <u>Findings of Fact</u>

### A.   ARV's Claimed Damages

ARV claims that as a result of Con-Dive's breach, it sustained damages in finding an alternate saturation diving system and support vessels to complete the work on the PTTEP project.[4] ARV argues that the amount of money it spent was "necessary to mitigate the significant potential exposure ARV would have incurred if it had not found an alternative to the Orca so ARV could fulfill its obligations to its client, PTT Exploration and Production Public

---

[4]Plaintiff ARV Offshore Co., Ltd's Trial Brief ("ARV's Post-Trial Brief"), Docket Entry No. 92, pp. 1, 2. The court ruled at trial that work done for PTT, rather than PTTEP, was outside the scope of contract and that, therefore, ARV could not recover damages on the PTT project. Day 1 Transcript, Docket Entry No. 83, pp. 80:8-13, 101:9-12.

Company Limited ("PTTEP")."[5]   In addition, ARV seeks compensation for the amount it paid to charter the Antinov, which ARV intended to use to transport the Orca.[6]   In total, ARV seeks to recover $5,426,867.75 in damages for Con-Dive's breach of the contract.[7]

**B.   Projected Costs on the PTTEP Work**

The middle horizontal column of Plaintiff's Exhibit 37, prepared by ARV's expert, summarizes its current damage model.   ARV is not pursuing damages for vessel mobilization or demobilization, other than the Antinov charge.[8]

Had Con-Dive performed, ARV would have paid for the Orca at a day rate of $50,000[9] and the support vessel Nor Valiant at a calculated day rate of $51,697.[10]   The number of days that the Orca and the Nor Valiant would have been in use, and therefore paid for

---

[5]ARV's Post-Trial Brief, Docket Entry No. 92, p. 1 ¶ 2.

[6]_Id._ at 1, 31.

[7]_Id._ at 34 ¶ 85; Transcript of Proceedings, July 12, 2011 ("Day 2 Transcript"), Docket Entry No. 84, p. 39:6-20.

[8]Day 2 Transcript, Docket Entry No. 84, pp. 49:18-50:6; ARV's Post-Trial Brief, Docket Entry No. 92, p. 24 ¶ 56.

[9]LOA, Plaintiff's Exhibit 1, Section 5.1.

[10]Plaintiff's Exhibit 8.   ARV's corporate representative testified that the $51,697 day rate for the Nor Valiant was calculated "based on what [ARV] actually paid for the Valiant as per the charter agreement."   Day 1 Trial Transcript, Docket Entry No. 83, p. 51:3-16.   The same rate appears on invoices billed to ARV for the Nor Valiant included in Plaintiff's Exhibit 10 (e.g., invoice labeled "ARV 00218").

by ARV, was not fixed in the contract.  In constructing the damages model, ARV's expert used the actual number of 58 vessel days that ARV required to complete the work with the alternate vessels (the Stephaniturm, Mermaid Commander, and Geosea) to conclude how many days the Orca, onboard the Nor Valiant, would have been in use had Con-Dive performed.[11]  ARV's expert testified that because he had no information indicating otherwise, he assumed that the Orca-Nor Valiant combination would have taken the same number of days to complete the work as the Stephaniturm-Mermaid-Geosea combination actually took to complete the work.[12]

ARV's expert calculated that had Con-Dive performed, the Orca would have been in use for 58 days at a rate of $50,000 for a total

---

[11]Day 2 Trial Transcript, Docket Entry No. 84, pp. 52:24-53:10.

[12]Id. at 54:12-55:4.  Con-Dive disputes the assumption that the Nor Valiant-Orca combination would have taken the same number of days as the Stephaniturm, Mermaid, and Geosea.  Con-Dive argues that the Nor Valiant "experienced frequent breakdowns" while the other three vessels "performed quite well" and did not "experience[] any mechanical downtime over the 58 days." Con-Dive's Post-Trial Reply Brief ("Con-Dive's Reply"), Docket Entry No. 104, pp. 6-11.  Because of the Nor Valiant's propensity to break down, Con-Dive argues that the Nor Valiant-Orca combination would have taken longer than the replacement vessels to complete the work and ARV's projected costs are, therefore, lower than those that could possibly have been incurred.  Id.  Con-Dive further argues that even if ARV would not have had to pay for the Nor Valiant on days when the Nor Valiant was not working, ARV would have had to pay for the Orca on days when the Nor Valiant was not working, resulting in a total of $7,032,326 of projected Orca costs rather than $3,606,959.04.  Id. at 10-11.  The parties can only speculate, however, what extra costs associated with the Orca would have been incurred in the event that the Nor Valiant broke down in a scenario where Con-Dive performed.  The argument that the Nor Valiant's breakdowns themselves invalidate ARV's damage model is addressed in Section II(D).

-5-

day rate cost of $2,900,000.[13]  With the addition of operating costs
of $356,959.04,[14] the credible evidence establishes that had Con-
Dive performed, ARV would have spent $3,256,959.04 on the Orca to
complete the PTTEP project.[15]

ARV had planned to use the Nor Valiant not only to support the
Orca, but also for eight days of remote operated vehicle work and
one and a half to two days of crane lift work.[16]  ARV's expert
therefore concluded that had Con-Dive provided the Orca, ARV would
have used and paid for 68 vessel days for the Nor Valiant.[17]  At the
calculated day rate of $51,697, ARV would have incurred a total day
rate cost of $3,515,396 for the Nor Valiant.  With the addition of
$3,186,916.36 of projected operating costs,[18] the credible evidence

---

[13]Plaintiff's Exhibit 37.

[14]Id.  In calculating the projected operating costs for the
Orca and the Nor Valiant, ARV's expert testified that he based
these figures on the actual operating costs incurred by ARV in
using the alternative vessels.  Day 2 Transcript, Docket Entry
No. 84, p. 59:5-6.

[15]Plaintiff's Exhibit 37.  The total amounts reflected on
Plaintiff's Exhibit 37 differ from the court's calculations because
all totals appearing in the exhibit include the mobilization and
demobilization costs, with the exception of totals that specifi-
cally indicate that those costs are excluded (appearing in italics
below the main total for each of the six subcharts and the excess
cost calculations).  Because ARV is not seeking damages based on
the increased cost to it of mobilizing and demobilizing the three
replacement vessels, the mobilization and demobilization costs of
the Orca and the Nor Valiant are excluded from the damages
calculation.  ARV's Post-Trial Brief, Docket Entry No. 92, pp. 24-
25.

[16]Day 2 Transcript, Docket Entry No. 84, p. 55:6-16.

[17]Id.

[18]Plaintiff's Exhibit 37.

establishes that had Con-Dive performed, ARV would have spent $6,702,312.36 for the use of the Nor Valiant to complete the project.

The credible evidence shows, therefore, that had Con-Dive performed, ARV would have spent $9,959,271.40 on the Orca and the Nor Valiant, excluding mobilization and demobilization.

ARV entered into an Aircraft Charter Agreement with Air Charter Service to provide an AN124 aircraft (the Antinov) to transport the Orca for $1,375,450.[19]  Under the contract, ARV had contracted to pay half of the air freight charge, with Con-Dive paying the other half.[20]  Since the charge for the Antinov was $1,375,450,[21] ARV would have paid $687,725 for the Antinov had Con-Dive not breached.

Adding this projected Antinov cost to the combined cost for the Orca and Nor Valiant yields the cost that ARV would have incurred had Con-Dive performed the contract with ARV: **$10,646,996.40.**

## C.   ARV's Actual Costs

Because of Con-Dive's breach, ARV was forced to go out into the market to acquire substitute systems to complete the work.

---

[19]Plaintiff's Exhibit 3.  The court notes that the version of the Agreement admitted into evidence is signed by ARV, but not by Air Charter Service.

[20]LOA, Plaintiff's Exhibit 1, Attachment 2, Section 1.1.

[21]Plaintiff's Exhibit 4 (Air Charter Service Invoice).

Because of market conditions it cost ARV substantially more to complete the work with the alternate systems it was able to acquire than it would have cost had Con-Dive performed.[22]  In total, the credible evidence shows that ARV paid $16,072,036.80 in order to complete the work.[23]

Plaintiff's Exhibit 37.  Plaintiff's Exhibit 37 (the spreadsheet summarizing ARV's damages model) is a summary of Plaintiff's Exhibit 38 (the vessel chronologies), Plaintiff's Exhibit 10 (the invoices), and the vessel logs.[24]  ARV's expert took the day rate for the vessels from the invoices submitted under Plaintiff's Exhibit 10.[25]  ARV's expert calculated the number of days worked on the PTTEP project from the daily logs of the vessels.[26]  While the daily logs of the vessels were not admitted into evidence, Plaintiff's Exhibit 38 contains a chronology of vessel activity that was based on the logs and which forms the basis for the number of charter days spent by each vessel on the PTTEP project reflected in Plaintiff's Exhibit 37.[27]  In calculating the operating costs actually paid on the PTTEP project, separated from those paid on the PTT project, ARV's expert "looked at the

---

[22]Day 2 Transcript, Docket Entry No. 84, pp. 56:24-57:14.

[23]Plaintiff's Exhibit 37.

[24]Day 2 Transcript, Docket Entry No. 84, pp. 40:12-15, 32:6-20.

[25]Id. at 50:22-24.

[26]Id. at 32:6-20.

[27]Id.

operating costs of the vessel during the charter period . . . [and] allocated the operating costs equally based on the number of days."[28]

In calculating operating costs ARV's expert acknowledged that there is "a little inconsistency between the vessels."[29]

> [F]or the most part, when you are renting a diving vessel, your day rate includes the vessel and the cost of the diving crew.  Okay.
>
> Your operating costs are going to include the fuel and some of the food and catering, okay, related to feeding that crew, as well as perhaps moving them and cycling them and replacing them with crews after 21 days or 30.  So, you have logistics costs in the operations.
>
> Now, the problem with some of these contracts is not everyone will treat the same items in the day rate as they do -- as what I'll call an extra cost, an operating cost.  So, one company might say:  Hey, my crews are extra costs; and the day rate is just the boat.  Another might come in and say:  Well, my day rate is the boat and the crew; but the extra costs are the food and the fuel. So, you have to look at both of them.  And I tried to do that uniformly on the same vessel-to-vessel basis and on a per day basis.[30]

The court finds the testimony of ARV's expert and the spreadsheet calculation of ARV's actual costs on the PTTEP project prepared by ARV's expert to be credible and persuasive.  More specifically, except for the two charges discussed in the next two paragraphs, the court finds that Plaintiff's Exhibit 37, in the left side of the middle horizontal column (titled "PTT-E&P Project

---

[28]<u>Id.</u> at 51:4-6.

[29]<u>Id.</u> at 58:2-3.

[30]<u>Id.</u> at 58:3-20.

Costs"), provides an accurate summary of the amounts paid on the PTTEP project by ARV, as supported by the invoices admitted in Plaintiff's Exhibit 10 and the testimony of ARV's expert.

ARV entered into a contract with Air Charter Service[31] requiring it to pay for the Antinov before Con-Dive breached its contract with ARV.[32] ARV paid the full air freight charge of $1,375,450.00 for the Antinov[33] (the amount reflected in the invoice included in Plaintiff's Exhibit 4) and not $1,375,464.85 (the amount reflected in Plaintiff's Exhibit 37).

The court also finds that there is insufficient evidence to support an award on the basis of any amount paid for the tug Erna. Plaintiff's Exhibit 37 reflects a charge of $1,812.50. This payment is supported by invoices contained in Plaintiff's Exhibit 10. Nevertheless, it was not established that this tug would not have been used had Con-Dive performed under the contract, and therefore it was not established that the tug cost is an extra cost incurred as a result of Con-Dive's breach. The court has identified only two places in the evidence where the Erna is referenced (the aforementioned entry in Plaintiff's Exhibit 37 and the invoices in Plaintiff's Exhibit 10), and the court finds that this evidence is insufficient to support an award of this cost.

---

[31]Plaintiff's Exhibit 3.

[32]LOA, Plaintiff's Exhibit 1.

[33]Plaintiff's Exhibit 4.

ARV's corporate representative (Mr. Stewart) testified that after Con-Dive's breach and after subsequent negotiations with Con-Dive broke down, "[ARV] had immediately started sourcing alternatives. And we went into the marketplace looking for SAT systems. Individual portable SAT systems similar to the Orca or to the Global Divers system were not available, but we were able to find a DSV on a vessel-of-opportunity basis."[34]  While a stand-alone system would have been preferable because it would have worked with the already-chartered Nor Valiant, ARV was forced to use instead a "built-in" diving system.[35]  Because the "offshore oil and gas industry was starting to overheat" at the time and "the market was very, very tight," the best that ARV was able to do was to charter three diving support vessels on a window-of-opportunity basis to complete the work:  the Stephaniturm, the Mermaid, and the Geosea.[36]

The court finds that the Geosea worked on the PTTEP project for 5.20 days[37] at a rate of $148,000 per day[38] for a total day rate cost of $769,600.[39]  The court accepts the calculation of Geosea's operating costs by ARV's expert of $29,049.29.[40]

---

[34]Day 1 Transcript, Docket Entry No. 83, pp. 42:21-43:1.

[35]Id. at 43:4-25.

[36]Id. at 44:4-23, 46:3-13.

[37]Plaintiff's Exhibit 37.

[38]Id.; Plaintiff's Exhibit 10 (Geosea invoices).

[39]Plaintiff's Exhibit 37.

[40]Id.

The court finds that the Mermaid worked on the PTTEP project for a total of 33.80 days for a total day rate cost of $6,055,477.22.[41] The court accepts the calculation of the Mermaid's operating costs of $35,807.33.[42]

ARV chartered the Nor Valiant in anticipation of using it with a saturation diving system before Con-Dive breached.[43] The court finds credible ARV's expert's calculation that the Nor Valiant worked a total of 39.90 days[44] on the PTTEP project for a total day rate of $2,207,100.02,[45] with $1,869,970.04 in operating costs.[46] ARV did not pay the full rate for the Nor Valiant on days when "the crane wasn't working at a 100% capacity,"[47] and the court accepts ARV's expert's testimony that these deductions are accurately reflected in the day rate costs contained in Plaintiff's Exhibit 37.

---

[41]Id.

[42]Id.

[43]Transcript of Proceedings, July 13, 2011 ("Day 3 Transcript"), Docket Entry No. 85, pp. 41:12-42:17.  Note that the Nor Valiant was chartered before ARV and Con-Dive entered into the contract, but for the purpose of putting a system such as the Orca on it.  Id.

[44]Plaintiff's Exhibit 37.

[45]Id.

[46]Id.

[47]Day 1 Transcript, Docket Entry No. 83, pp. 107:21-108:4, 92:7-13, 110:1-12.

The court finds that Stephaniturm worked for 19.30 days on the PTTEP project[48] at a rate of $192,000 per day[49] for a total day rate cost of $3,705,600,[50] with $23,982.90 in operating costs.[51]

In sum, based on the court's review of Plaintiff's Exhibit 37 (the spreadsheet containing the damages model) in conjunction with Plaintiff's Exhibit 10 (the invoices that provide the basis for that model) and the testimony of ARV's expert, the court finds that ARV actually paid out $16,072,036.80 in order to complete PTTEP work after Con-Dive breached the contract.  This $16,072,036.80 is the sum of the following costs:

| | | |
|---|---|---|
| Full charge for the Antinov | = | $1,375,450.00 |
| Geosea day rate cost | = | $ 769,600.00 |
| Geosea operating costs | = | $ 29,049.29 |
| Mermaid day rate cost | = | $6,055,477.22 |
| Mermaid operating costs | = | $ 35,807.33 |
| Nor Valiant day rate cost | = | $2,207,100.02 |
| Nor Valiant operating costs | = | $1,869,970.04 |
| Stephaniturm day rate cost | = | $3,705,600.00 |
| Stephaniturm operating costs | = | $ 23,982.90 |
| **TOTAL ACTUAL COSTS PAID BY ARV** | | **$16,072,036.80** |

## D.  The Reasonableness of the Actual Costs

On the basis of the liability that ARV may have incurred had it breached its own contractual obligations to PTTEP,[52] the court

---

[48]Plaintiff's Exhibit 37.

[49]Plaintiff's Exhibit 10 (Stephaniturm invoices).

[50]Plaintiff's Exhibit 37.

[51]Id.

[52]Defendant's Exhibit 18.

-13-

finds that ARV was reasonable in going into the market to find an alternative diving system after Con-Dive failed to provide the Orca.

ARV's expert testified as follows when asked at trial whether the actual costs incurred by ARV in the wake of Con-Dive's breach were reasonable and necessary:

> When vessels are in short supply and you need one at the last moment, my experience is you pay through the nose. So, the premiums that were paid for these vessels for last second charters are not unreasonable or uncharacteristic of what happens in the industry.[53]

ARV's expert also testified that the actual number of vessel days used by the replacement vessels was reasonable and necessary to complete the PTTEP work.[54]   The court finds that the expert's testimony as to the reasonableness of the actual amounts paid is credible and persuasive, and the court finds that the actual amounts expended by ARV in completing the PTTEP work was reasonable under the circumstances.

The court is also persuaded that ARV reasonably mitigated its damages with regard to the Antinov.   ARV's agreement with Air Charter Service for the Antinov contained an escalating penalty for late cancellation.[55]   After Con-Dive sent an e-mail stating that it

---

[53]Day 2 Transcript, Docket Entry No. 84, pp. 56:24-57:9.

[54]Id. at 57:10-14.

[55]Aircraft Charter Agreement, Plaintiff's Exhibit 3, p. 1 (section entitled "Cancellation").

-14-

would not deliver the Orca,[56] ARV had reason to believe Con-Dive's assurances[57] that it would locate a substitute SAT diving system to be transported by the Antinov and had reason to believe that the substitute SAT diving system would be provided on terms substantially similar to those in the contract.  ARV therefore delayed its cancellation of the Antinov until it was forced to incur the full cost of the air charter service.[58]  The court finds that ARV acted reasonably in delaying its cancellation of the Antinov and that the full charge it actually paid to Air Charter Service was reasonable mitigation properly included in the actual costs used to compute ARV's damages.

**E.   Attorney's Fees**

ARV's counsel testified at trial that the reasonable and necessary attorney's fees incurred by ARV in litigating its breach

---

[56]Plaintiff's Exhibit 6 (July 10, 2008, e-mail from Joe Parker stating, "[t]his is to inform you that the Orca saturation system is no longer available for deployment on the subject project.").

[57]Id. ("Con-Dive intends to fulfill its scope of work on the project by utilizing another sat diving system that (1) is IMCA certified, (2) does not require air freighting, and (3) has availability in line with the project schedule parameters."). This e-mail expressed an intent to deliver an alternative system to the Orca, but one that did not require air freighting.  The alternative system that Con-Dive ultimately offered -- on terms substantially more expensive than those set out in the contract -- actually did require air freighting from Houston to the Nor Valiant. Plaintiff's Exhibit 40 (July 15, 2008, e-mail from Joe Parker). ARV therefore acted reasonably in not cancelling the Antinov earlier than it did.

[58]Day 1 Transcript, Docket Entry No. 83, p. 40:18-22.

-15-

of contract claim totaled $80,699.63.[59]  Con-Dive stated that it did
not object to the reasonableness of this amount of attorney's
fees.[60]  The court agrees, and finds that $80,699.63 is the amount
of reasonable and necessary attorney's fees incurred by ARV in
litigating its breach of contract claim.

ARV requests $25,000.00 in the case of an unsuccessful appeal
by Con-Dive to the Fifth Circuit, $10,000.00 to respond to a writ
of certiorari to the Supreme Court of the United States, and
$5,000.00 in the event that such writ is granted.[61]  ARV's counsel
testified at trial as to the reasonableness of these estimates.[62]
The court finds that these estimates of attorneys fees on appeal
are reasonable.

## II.   <u>Conclusions of Law</u>

### A.   <u>Texas Law, and Not Admiralty Law, Controls This Case</u>

In its Post-Trial Brief, Con-Dive asserts for the first time
that this case is controlled by admiralty law and not the law of
the state of Texas.[63]  ARV's Complaint invokes only this court's

---

[59]Day 2 Transcript, Docket Entry No. 84, p. 86:17-23.

[60]<u>Id.</u> at 86:25-87:1.

[61]ARV's Post-Trial Brief, Docket Entry No. 92, pp. 2, 33-34.

[62]Day 2 Transcript, Docket Entry 84, p. 88:6-10.

[63]Con-Dive's Post-Trial Brief, Docket Entry No. 98-4, pp. 7, 30.

diversity jurisdiction.[64]  Con-Dive's Answer contains no reference
to maritime law.[65]  The Joint Pretrial Order (Docket Entry No. 67)
refers to Texas substantive law.[66]  ARV argues that Con-Dive has
waived this issue by failing to include it in the Joint Pretrial
Order or any other filing with this court before its post-trial
brief.[67]

The court concludes that Texas law governs this case because
Con-Dive waived this issue by not including it in the Joint
Pretrial Order.  The joint pretrial order "controls the course of
the action unless the court modifies it."  Fed. R. Civ. P. 16(d).
Claims or issues omitted from the pretrial order "are waived, even
if [they] appeared in the complaint."  Kona Tech. Corp. v. S. Pac.
Transp. Co., 225 F.3d 595, 604 (5th Cir. 2000).  Choice-of-law
issues are waivable.  See Fruge v. Amerisure Mut. Ins. Co., 2011
WL 5842821, at *2 (5th Cir. 2011) (finding a choice-of-law question
waived on appeal by virtue of the party's failure to raise the
issue before the district court).  While a court may raise the
choice of law issue on its own, it does so "where manifest

---

[64]Plaintiff ARV Offshore Co., Inc's Original Complaint, Docket
Entry No. 1, p. 1.

[65]Defendant Con-Dive, L.L.C.'s Original Answer, Docket Entry
No. 5.

[66]Joint Pretrial Order, Docket Entry No. 67, pp. 4, 9-10.

[67]Plaintiff's Response to Defendant's Post-Trial Brief and
Revised Proposed Findings of Fact and Conclusions of Law ("ARV's
Response"), Docket Entry No. 103, pp. 4-6.

injustice would otherwise result," which requires a showing greater than that "the application of another state's law would produce a different result." Triad Elec. & Controls, Inc. v. Fireman's Fund Ins. Co., 2005 WL 2647955, at *2 (N.D. Tex. 2005) (citing Am. Int'l Trading Corp. v. Petroleos Mexicanos, 835 F.2d 536, 540 (5th Cir. 1987)).  A choice-of-law issue must be raised to the district court "in time to be properly considered." Kucel v. Heller & Co., 813 F.2d 67, 74 (5th Cir. 1987).

Con-Dive failed to argue the issue of whether maritime or Texas law governed the contract at any point before its post-trial briefing.  The court therefore concludes that Con-Dive waived this issue and that Texas law will govern, in accordance with the Joint Pretrial Order.[68]

**B.  Breach of Contract Damages Under Texas Common Law**

In a breach of contract case under Texas law the "ultimate goal in measuring damages . . . is to provide just compensation for

---

[68]Joint Pretrial Order, Docket Entry No. 67, pp. 9-10.  The court also concludes that ARV has waived its argument that Article 2A of the Texas version of the Uniform Commercial Code applies.  ARV cites to Article 2A in its post-trial briefing. ARV's Post-Trial Brief, Docket Entry No. 92, pp. 2, 28-29.  It is at least arguable that Article 2A could apply to this case.  See Frank's Int'l, Inc. v. Smith Int'l, Inc., 249 S.W.3d 557 (Tex. App.—Houston [1st Dist.) 2008, no pet.) (holding that Article 2A applied to a lease of oilfield equipment in a breach of contract case, even where the lease included a provision for maintenance services).  The Joint Pretrial Order references only Texas common law in the sections titled "Agreed Applicable Propositions of Law" and "Contested Issues of Law" insofar as they concern the breach of contract claim.  Joint Pretrial Order, Docket Entry No. 67, pp. 9-10.  The court therefore concludes that ARV's argument for the application of Article 2A is waived.  The court will apply the Texas common law of contracts to this dispute.

-18-

any loss or damage actually sustained as a result of the breach." Clear Lake City Water Auth. v. Friendswood Dev. Co., 344 S.W.3d 514, 523 (Tex. App.–Houston [14th Dist.] 2011, no pet h.) (internal quotation marks omitted); accord Bowen v. Robinson, 227 S.W.3d 86, 96 (Tex. App.–Houston [1st Dist.] 2006, no pet.). The purpose of this measure of damages "is to restore the injured party to the economic position it would have been in had the contract been fully performed." Clear Lake, 344 S.W.3d at 523. The Fifth Circuit has applied this measure of damages to breach of contract cases on numerous occasions. E.g., DP Solutions, Inc. v. Rollins, Inc., 353 F.3d 421, 428 (5th Cir. 2003) ("Under Texas law, the proper damages award for a breach of contract is the amount necessary to put the party 'in the same economic position in which it would have been had the contract not been breached.'"); Reynolds Metals Co. v. Westinghouse Elec. Corp., 758 F.2d 1073, 1079 (5th Cir. 1985) ("The law of contract, whether under the common law or the Uniform Commercial Code, generally authorizes damages for breach in the amount of the expectancy interest of the wronged party. That is, the rules for contract damages are intended to place the victim of the breach in the same position he would have occupied had the breach not occurred.").

The court must determine how to put ARV into the same economic position it would have been had Con-Dive provided the Orca. A review of § 347 of the Restatement (Second) of Contracts, cited with approval by Texas courts, and damage awards by Texas courts in

construction contract cases provide the basis for a more specific formulation of the general contract damages rule.

The Restatement (Second) of Contracts states that "where the injured party has simply had to pay an additional amount to arrange a substitute transaction and can be adequately compensated by damages based on that amount," this sum will be sufficient to put the nonbreaching party in the position it would have been had the breach not occurred.  <u>Restatement (Second) Contracts</u> § 347 cmt. a (1981).  The Restatement later notes in the same section that where "the breach itself results in a saving of some cost that the injured party would have incurred if he had had to perform," "[t]his cost avoided is subtracted from the loss in value caused by the breach in calculating his damages."  <u>Id.</u> at § 347 cmt. d.  The Restatement formulation of the general contract damages rule has been cited with approval in Texas.  <u>E.g.</u>, <u>Lefarge Corp. v. Wolff, Inc.</u>, 977 S.W.2d 181, 187 (Tex. App. -- Austin 1998, pet. denied) ("A party's expectation interest is measured by his anticipated receipts and losses caused by the breach less any cost or other loss he has avoided by not having to perform.") (emphasis omitted).

In construction contracts the following calculation has been used by courts to put the plaintiff in the position it would be in had the contract been performed:

> Damages for breach of contract are the contract price, less the cost of completion.  As applied in construction cases, the general rule is that the correct measure of damages resulting from the breach of a building contract is the reasonable cost of remedying the defects which constitute the breach.

_Driver Pipeline Co. v. Mustang Pipeline Co._, 69 S.W.3d 779, 786 (Tex. App.—Texarkana 2002, _rev'd in part on other grounds_, 134 S.W.3d 195 (Tex. 2004)) (internal citations omitted).  An earlier Fifth Circuit opinion put the rule more directly:

> By the contract the plaintiff acquired the right to have a well drilled by defendant on the leased land as stipulated.  A result of defendant's failure to do what it contracted to do was to make it liable to the plaintiff for the amount of the reasonable cost of having that done which the defendant obligated itself to do.

_All-American Oil & Gas Co. v. Connellee_, 3 F.2d 107, 107-08 (5th Cir. 1925).  This rule has been followed by this court as recently as 2009.

> In contracts for the construction or repair of property, a plaintiff may recover the reasonable cost of remedying any defects in performance or of getting the whole job done elsewhere if there has been a complete failure of performance.  However, the complaining party cannot recover damages exceeding the amount he would have received had the contract not been broken.

_Dinn v. Hooking Bull Boatyard, Inc._, 2009 WL 2161676, at *4 (S.D. Tex. 2009) (internal citations omitted) (applying Texas substantive law).

The court concludes that in order to put ARV into the economic position it would have occupied had Con-Dive performed its obligations under the contract, the court should award damages equal to the reasonable amount that ARV actually paid to complete the PTTEP work with alternate vessels (the cost of completion), less the amount that ARV would have paid to complete the PTTEP work had Con-Dive provided the Orca (the cost avoided).

-21-

**C.   Calculation of ARV's Damages:  The Amount Necessary to Put ARV into the Same Position it Would Have Been in had Con-Dive Performed**

As the court's findings above reflect, ARV reasonably spent $16,072,036.80 in order to complete the PTTEP work that it would have completed using the Orca had Con-Dive performed its obligations under the contract.  Had Con-Dive performed, ARV would have spent $10,646,996.40.  The sum required to put ARV into the economic position it would have been in had Con-Dive not breached is, therefore, **$5,425,040.40.**  The court will award this amount to ARV as damages for Con-Dive's breach of the contract.

**D.   Counter-arguments Made by Con-Dive**

<u>Duration of the Contract</u>.  Con-Dive argues that the contract had a fixed, 90-day duration that ended on September 24.[69] Section 12.1 of the contract states:  "Notwithstanding anything to the contrary herein, the validity of this LOA shall expire upon the execution of the formal Subcontract or ninety (90) days from the date first appearing above, whichever is the earliest, unless and to the extent otherwise agreed in writing between the Parties."[70] Con-Dive argues that it is impossible that the Nor Valiant-Orca combination could have finished the work on the PTTEP project in this 90-day window and that ARV is therefore not entitled to

---

[69]Con-Dive's Reply, Docket Entry No. 104, pp. 5-11; Con-Dive's Post-Trial Brief, Docket Entry No 98-4, p. 25.

[70]LOA, Plaintiff's Exhibit 1, p. ARV 00009.

recover on a damages model that assumes that the work could have been completed had Con-Dive performed.[71] As evidentiary support for this argument, Con-Dive points to the alleged propensity of the Nor Valiant to break down and to the alleged late arrival of the Nor Valiant to the PTTEP job site.[72]

Con-Dive's argument bears on the question of what damage award would be necessary to put ARV in the same economic position it would have been had the contract been performed. If Con-Dive's full performance would not have enabled ARV to complete the PTTEP work, then ARV would not be entitled to damages equivalent to the cost of completing the PTTEP work less the cost avoided.

The court is not persuaded by Con-Dive's argument for several reasons. First, Con-Dive uses incorrect values in its calculations. Con-Dive emphasizes the Nor Valiant's late arrival to the PTTEP job-site. The court finds the date of the Nor Valiant's arrival insignificant, however, since given the absence of the Orca, there was no reason to deploy the Nor Valiant to the job-site until an alternative diving system was available. As to the delay in the project more generally, the court finds credible the testimony of ARV's expert that during the period in question the "market was very tight, and basically everyone was dealing with

_____

[71]Con-Dive's Reply Brief, Docket Entry No. 104, pp. 5-11.

[72]Id. at 5, 7-10; Con-Dive's Post-Trial Brief, Docket Entry No. 98-4, p. 25.

windows of opportunities as projects slipped."[73]  Moreover, Con-Dive improperly includes suspension of hire time in its calculations of the Nor Valiant's deficiencies.[74]  ARV mitigated its damages by off-hiring the Nor Valiant, thereby reducing its actual costs.[75]  The court finds that the suspension of hire periods are not evidence of the Nor Valiant's poor performance or propensity to break down.

Con-Dive also notes that the Nor Valiant experienced 19.1 days of mechanical downtime.[76]  There was credible evidence, however, that even on days where the Nor Valiant was working at less than 100% capacity, it was able to do some work.[77]  If one assumes that the Nor Valiant was able to perform only 50% of its daily work on these 19.1 days, the Nor Valiant could have nevertheless performed the 68 days of work required of it within the 90-day period: Reducing the 19.1 ineffective days by 50% (because of the assumption that the Nor Valiant was 50% effective on those days) yields a result of 9.55 ineffective days (over 48.95 on-hire days[78])

---

[73]Day 2 Transcript, Docket Entry No. 84, pp. 46:19-48:12.

[74]Con-Dive's Post-Trial Brief, Docket Entry No. 98-4, p. 25; Con-Dive's Reply, Docket Entry No. 104, p. 7.

[75]Day 1 Transcript, Docket Entry No. 83, p. 54:4-6.

[76]Con-Dive's Post-Trial Brief, Docket Entry No. 98-4, p. 25.

[77]Day 1 Transcript, Docket Entry No. 83, p. 96:10-13.

[78]This 48.95 value is taken, for the purposes of evaluating Con-Dive's argument, from Con-Dive's briefing:  Con-Dive alleges a relevant period of 67.25 days and the court subtracts the 18.3 suspension-of-hire days as irrelevant to reach the 48.95 total days on site value.  Con-Dive's Reply, Docket Entry No. 104, pp. 8-9.

in which it was completely ineffective.  The Nor Valiant was thus effective 80.5% of the time.[79]  Over the 90-day period of the contract the Nor Valiant would therefore have been effective on at least 72 days, 4 more days than needed.  Even accepting Con-Dive's analytical framework, the court therefore concludes that the Nor Valiant, working with the Orca, was sufficiently effective to complete the work within 90 days.

Second, Con-Dive's argument overlooks the overall contractual relationship between ARV and Con-Dive.  The contract agreed to by ARV and Con-Dive included a plan to replace the contract with another agreement, the "Subcontract."  Section 2.1 of the contract provided that "[t]his LOA shall be replaced by a formal Subcontract Agreement (hereinafter "Subcontract") to be entered into by the Parties as quickly as is practical after the date hereof, but under no circumstances later than the date upon which the Subcontractor's Diving System is placed on Contractor's Vessel."  Because of Con-Dive's breach, the ultimate deadline for entering into the Subcontract (and therefore extending Con-Dive's obligation to provide the Orca past the 90-day window) never materialized.  The crux of Con-Dive's argument is that Con-Dive's failure to perform its obligations under the contract saves Con-Dive from having to compensate ARV for the full amount of the direct and foreseeable damages that ARV incurred as a result of Con-Dive's breach.  The

---

[79]The Nor Valiant was effective for 39.4 of the total 48.95 days on-hire, i.e., 80.5% of the time.  The 39.4 effective days figure is calculated by reducing the number of on-hire days (48.95) by the number of ineffective days (9.55) determined above.

court rejects this argument because it would not be equitable to limit ARV's damages by allowing Con-Dive to exploit the timing of its own breach.

Because Con-Dive has presented no persuasive arguments or evidence to the contrary, the court remains persuaded by the credible testimony of Mr. Stewart, the managing director of ARV since 2005,[80] that had the Orca been provided, it would have taken 90 days to complete the PTTEP work.[81]  The court therefore finds that ARV would have completed the PTTEP work within the 90 days set out in the contract if Con-Dive had provided the Orca.

Alleged Revenues Received by ARV.  Con-Dive argues that ARV would receive a "windfall recovery" and "be put in a better position than had the contract been performed" were the court to award ARV damages in this case.[82]  Con-Dive alleges that ARV made a profit from most of the additional vessel costs it sustained.[83] Con-Dive cites the testimony of Mr. Stewart in support of this claim.[84]  At trial, Mr. Stewart gave the following testimony:

---

[80]Day 1 Transcript, Docket Entry No. 83, p. 21:8-11.

[81]Id. at 28:10-29:14.

[82]Con-Dive's Post-Trial Brief, Docket Entry No. 98-4, pp. 17-20; Con-Dive's Reply, Docket Entry No. 104, pp. 1-5.

[83]Con-Dive's Post-Trial Brief, Docket Entry No. 98-4, pp. 18-20.

[84]Con-Dive quotes the following testimony of Mr. Stewart:

Q.   In fact, if we look at all of the expenses that ARV lists
     as its actual expenses in this case, which serves as the
     basis for its damage calculations -- and those expenses
                                                  (continued...)

Q.    So, to the extent you had extra vessel days, ARV was, in fact, reimbursed by its customers for all extra days excepting only eight days for the Nor Valiant and seven to eight days for the Geosea, correct?

A.    Correct.  And may I just qualify?  There was, I believe, another couple of half days or three-quarter days that maybe amounted to an extra couple of days total.

Q.    But essentially that's right?

A.    Yes.  Correct.[85]

Con-Dive argues that in order to "assess[] whether ARV suffered a loss, evidence of revenue is essential."[86]  Con-Dive then cites testimony by ARV's damages expert that "[i]f you want to know what profit or loss is, you have to study revenue; but that was outside the scope of my engagement."[87]  Con-Dive argues that "ARV cannot have proven damages when its own expert on damages admits that ARV has not established a loss -- and may even have *profited*

---

[84](...continued)
        appear as Plaintiff's Exhibit 9.  If we look at those expenses, isn't it true that ARV was reimbursed by its customer for all vessel days -- . . . except for eight days for the vessel Nor Valiant and seven to eight days for the vessel Geosea?  It's true, isn't it?

A.    Excluding for the -- excluding the base scope, which was a lump sum, yes.

Day 2 Transcript, Docket Entry No. 84, p. 6:12-25 (quoted in Con-Dive's Post-Trial Brief, Docket Entry No. 98-4, p. 19).

[85]Day 2 Transcript, Docket Entry No. 84, p. 7:7-15.

[86]Con-Dive's Post-Trial Brief, Docket Entry No. 98-4, p. 19.

[87]Day 2 Transcript, Docket Entry No. 84, p. 75:20-22.

from Con-Dive's alleged breach."[88]  Con-Dive's argument boils down to the contention that a "reimbursed cost is not a loss,"[89] that the majority of ARV's costs were reimbursed, and that "[a] damage award of a reimbursed cost is a windfall,"[90] putting ARV in a <u>better</u> position than it would have been in had Con-Dive performed.

Con-Dive bears the burden of showing that ARV received a benefit from its increased expenditures, i.e., that it was paid back and even made a profit from the increased number of vessel days associated with its PTTEP project.  <u>See Amigo Broadcasting, LP v. Spanish Broadcasting Sys., Inc.</u>, 521 F.3d 472, 486 (5th Cir. 2008) ("[I]t is the burden of [the breaching party], not the [nonbreaching party], to show that [the nonbreaching party] received a benefit from its expenditure that reduce[s] or offset[s] the amount of reliance damages to which [the nonbreaching party] claims it is entitled.").  The court finds that Con-Dive has failed to carry this burden.[91]  While the testimony quoted above is some

---

[88]Con-Dive's Post-Trial Brief, Docket Entry No. 98-4, p. 20.

[89]<u>Id.</u> at 23 (applying this argument to the Geosea).

[90]Con-Dive's Reply, Docket Entry No. 104, p.3.

[91]Con-Dive argues that "ARV has assiduously avoided presenting any evidence of its revenues or profit.  In fact, it improperly failed to produce such evidence when requested in discovery." Con-Dive's Reply, Docket Entry No. 104, p. 5.  Because Con-Dive bears the burden of proving that ARV was compensated for its costs, it was not ARV's responsibility to ensure that this evidence is submitted to the court.  As to the allegations of impropriety in the discovery process, this is an issue that should have been raised to the court before trial, not for the first time in the defendant's post-trial briefing.

evidence that ARV was reimbursed for most of the vessel days, the court finds that this evidence by itself is insufficient. There is no evidence before the court documenting or substantiating payments reimbursing ARV, such as invoices issued by ARV or deposition testimony by ARV's client indicating that it reimbursed ARV a certain sum. For this reason, the court is not persuaded by Con-Dive's arguments based on ARV's alleged reimbursements for costs.

**E.   Interest**

Prejudgment Interest. Because this is a diversity case, Texas law governs the award of prejudgment interest. Arete Partners, L.P. v. Gunnerman, 643 F.3d 410, 412 (5th Cir. 2011). Prejudgment interest "is intended to compensate a plaintiff for the lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." Id. at 412-13 (internal quotation marks and citations omitted). "[U]nder Texas law, whether entitlement to prejudgment interest is derived from statute or . . . equity, prejudgment interest accrues at the rate for postjudgment interest." Id. at 415 (quoting Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 532 (Tex. 1998)) (internal quotation marks omitted).

The Texas Supreme Court has adopted as the common law rule the statutory scheme governing prejudgment interest. Johnson & Higgins, 962 S.W.2d at 531. Section 304.003 of the Texas Finance

Code sets the post-judgment interest rate, giving it a "'floor interest rate' of five percent." <u>Arete Partners</u>, 643 F.3d at 415. Because the prime rate set by the Federal Reserve Board of Governors is currently below 5%, the court must apply the 5% rate of prejudgment interest. Under Section 304.104 of the Texas Finance Code, prejudgment interest is computed as simple interest and "accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed, and ending on the day preceding the date judgment is rendered."

While prejudgment interest is recoverable on ARV's damage award for Con-Dive's breach, prejudgment interest is not recoverable on ARV's attorney's fees. <u>Cain v. Pruett</u>, 938 S.W.2d 152, 158 (Tex. App.—Dallas 1996, no pet.).

ARV first presented its claim to Con-Dive on February 27, 2009.[92]  ARV filed this action on March 30, 2009.[93]  Prejudgment interest will run from March 30, 2009, until January 19, 2012, the day preceding the date the judgment accompanying this Memorandum and Opinion is entered, for a total of 1,026 days.

---

[92]Plaintiff's Exhibit 15 (cited in ARV's Post-Trial Brief, Docket Entry No. 92, p. 32 ¶ 79).

[93]Plaintiff ARV Offshore Co., Inc.'s Original Complaint, Docket Entry No. 1 (filed in the Southern District of Texas on March 30, 2009).

Applying the prejudgment interest rate of 5% per annum for 1,026 days to the award of contract damages ($5,425,040.40) yields an award of prejudgment interest of $762,478.28.

Post-Judgment Interest. Post-judgment interest is governed by federal law and awarded as a matter of course under 28 U.S.C. § 1961(a). Meaux Surface Protection, Inc. v. Fogleman, 607 F.3d 161, 173 (5th Cir. 2010). Section 1961 provides that "[i]nterest shall be allowed on any judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." The current rate is 0.11%. ARV is entitled to post-judgment interest on its damages award for Con-Dive's breach, its attorney's fees, and the prejudgment interest award. Totran Transp. Services, Ltd. v. Fitzley, Inc., 2010 WL 2787659, at *2 (S.D. Tex. 2010); Fuchs v. Lifetime Doors, Inc., 939 F.2d 1275, 1280 (5th Cir. 1991).

The court will award ARV post-judgment interest at the rate of 0.11%, compounded annually, on the damage award for Con-Dive's breach ($5,425,040.40), its award of prejudgment interest ($762,478.28), and its award of attorney's fees ($80,699.63), beginning from date of entry of the final judgment accompanying this Memorandum Opinion and Order.

**F.    Attorney's Fees and Costs**

Attorney's Fees.    Under Section 38.001 of the Texas Civil Practice and Remedies Code, "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . [8] an oral or written contract."    The Fifth Circuit has articulated the rule that "an award of reasonable fees is mandatory if a party prevails in a breach of contract case and there is proof of reasonable fees."  DP Solutions, Inc. v. Rollins, Inc., 353 F.3d 421, 433 (5th Cir. 2003).[94]

In accordance with the court's finding of fact above concerning ARV's attorney's fees, the court will enter an order that Con-Dive compensate ARV for its attorney's fees in the sum of **$80,699.63**.

In cases for breach of contract under Texas law, "a party entitled to recover attorneys' fees at trial is also entitled to recover them for successfully defending the case on appeal.  DP Solutions, 353 F.3d at 436 (citing Gunter v. Bailey, 808 S.W.2d 163, 166 (Tex. App.—El Paso 1991, no writ.)).  Any award of fees on

---

[94]Because this case is governed by Texas substantive law, Con-Dive's contention that the award of attorney's fees is precluded by federal maritime law is without merit.  Con-Dive's Post-Trial Brief, Docket Entry No. 98-4, p. 30 (citing Texas A&M Research Found. v. Magna Transp., Inc., 338 F.3d 394, 405-06 (5th Cir. 2003) (concluding that "the general rule of maritime law that parties bear their own costs, coupled with the need for uniformity in federal maritime law, precludes the application of state attorneys' fees statutes, such as § 38.001, to maritime contract disputes")).

appeal "must be conditioned on the appeal being unsuccessful." Gilbert v. City of El Paso, 327 S.W.3d 332, 337 (Tex. App.—El Paso 2010, no pet.).

The court finds that ARV is entitled to **$25,000** in the case of an unsuccessful appeal by Con-Dive to the Fifth Circuit, **$10,000** to respond to a writ of certiorari submitted to but denied by the Supreme Court, and **$5,000** in case the Supreme Court agrees to hear the case and ARV prevails.

Costs.  Federal Rule of Civil Procedure 54(d)(1) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing party." While a district court has "wide discretion whether to award costs," the Fifth Circuit has noted that there is a "'strong presumption'" that costs will be awarded to the prevailing party. Energy Mgmt. Corp. v. City of Shreveport, 467 F.3d 471, 483 (5th Cir. 2006).  The court concludes that ARV as the prevailing party is entitled to recover costs pursuant to Rule 54(d)(1).

### III.  Conclusion

If any finding of fact should more properly be characterized as a conclusion of law, it is hereby adopted as a conclusion of law.  If any conclusion of law should more property be character-ized as a finding of fact, it is hereby adopted as a finding of fact.

On the basis of the above findings of fact and conclusions of law, the court concludes that Con-Dive must compensate ARV in the amount of $5,425,040.40 for the breach of contract, $762,478.28 for prejudgment interest, $80,699.63 in attorney's fees, post-judgment interest at a rate of 0.11% compounded annually on the sum of these three awards, and for ARV's costs allowed under 28 U.S.C. § 1920.

All other relief not expressly granted is **DENIED**.

**SIGNED** at Houston, Texas, on this 20th day of January, 2012.

SIM LAKE
UNITED STATES DISTRICT JUDGE

-34-